# <u>EXHIBIT "A"</u>

# Preliminary Psychodiagnostic Evaluation Report - June 23, 2025

June 23, 2025


Sanford Schulman
Federal Criminal Attorneys of Michigan
500 Griswold Street
Suite 2340
Detroit, Michigan 48226


**RE:  RYAN ROMARIO DOOKHAN**
**DOB: 12/11/1994**
**CASE NO: 1:25-cr-00011-HYJ**

## PRELIMINARY PSYCHODIAGNOSTIC EVALUATION REPORT


***Identifying Information:***  Ryan Romario Dookhan was a 30-year-old male referred for a psychodiagnostic evaluation.  In Case No. 1:25-cr-00011-HYJ, Mr. Dookhan has been charged with three counts of Sexua. Exploitation of a Child in violation of 18 U.S.C. § 2251(a) and (c) and 18 U.S.C. § 2256(2).  At the time of the evaluation, Mr. Dookhan was detained at the Ingham County Jail in Mason, Michigan.  This evaluation was conducted via the secure teleconferencing system Zoom.

***Statement of Non-Confidentiality:***   Prior to interview, Mr. Dookhan was informed that all information gathered was not confidential and would be used in a report to be submitted to the court.  Mr. Dookhan was advised that this evaluation was for court and was not for the purposes of treatment.  Mr. Dookhan stated that his attorney informed him of the evaluation, and that the purpose was "an evaluation of the charges and to see if [I have] any mental health concerns."  He inquired if the evaluation was "pass/fail," and I informed him that the evaluation was to determine if he met criteria for any mental health disorders to advise the court.  When asked to summarize the information provided, Mr. Dookhan stated, "my attorney and [the prosecutor] may receive this information" and "it will be used in a report for the court." He acknowledged that I would not be providing mental health treatment to him.  Mr. Dookhan stated that he understood this information. I informed Mr. Dookhan that he was not required to participate in the evaluation, and he could end the evaluation at any time.  I told Mr. Dookhan that should he elect not to participate in the evaluation, I would inform the court.  He reported that he understood this information. Mr. Dookhan agreed to proceed with the evaluation.

Mr. Dookhan confirmed that his primary language is English, that he did not speak other languages, and that he did not require a translator for the evaluation.

***Sources of Information:***

1. Interview of Ryan Romario Dookhan via Zoom at the Ingham County Jail on June 4, 2025, for approximately two hours.
2. Indictment for Case No. 1:25-cr-00011-HYJ dated January 28, 2025.
3. Criminal Complaint for Case No. 1:24-mj-544 dated December 31, 2024.

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

4. Continuation in Support of Criminal Complaint Report filed by David T. Deuman, Special Agent of the United States Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), and Homeland Security Investigations (HIS), undated.
5. Penalty Sheet for Case No. 1:24-mj-544 dated January 15, 2025.
6. Arrest Warrant for Case No. 1:24-mj-544, dated December 31, 2024.
7. Telephone interview with defendant's brother, Roberto Dookhan, on June 19, 2025, for approximately one hour.

I requested educational records from John Adams High School in Queens, NY.  Mr. Dookhan signed an authorization for release of records, executed by his attorneys.  These records were not received at the time of this report submission and may impact final opinion once received.

***Relevant Background Information***:  Ryan Romario Dookhan was born on December 11, 1994, in Guyana to married parents, Mark and Bibi Dookhan.  He is the youngest of three children; his brother Roberto is four years older, and his sister Marsena is two years older.  Mr. Dookhan grew up in Guyana before moving to the United States.  He described his family as "a close, loving family."  He recalled his childhood in Guyana positively, noting that he would attend church, go fishing, and play games with family members, specifically cricket.

Mr. Dookhan and his family moved to the United States in November 2010.  The family initially moved to Florida to be near his maternal relatives but then moved to New York at the recommendation of family and friends approximately one year later.  Mr. Dookhan reported living with his parents in Queens since their arrival to New York.  His father is a forklift operator, and his mother works for an export company.  His older brother Roberto also lives with the family.  He completed a master's degree in pharmaceutical science and business, and he works in consumer safety for the Food and Drug Administration (FDA).  His sister Marsena moved out after getting married.  She completed a master's degree in accounting and works as an accountant.

Mr. Dookhan disavowed a history of traumatic events in childhood, including verbal, physical, or sexual abuse or neglect.  He reported physical bullying by peers on two occasions in Guyana.  These events did not result in physical injury.  Mr. Dookhan disavowed bullying while living in the United States.  He has experienced multiple losses of close family members, including his maternal grandfather when he was 18 years old, his paternal grandfather when he was 23 years old, and his maternal grandmother when he was 28 years old.  He also reported experiencing a hurricane in approximately 2014, but it did not result in injury or housing instability.  Mr. Dookhan's brother, Roberto Dookhan, confirmed no trauma history in childhood during my telephone interview with him.  He confirmed a history of bullying by peers towards Mr. Dookhan in primary school (see Developmental History below).

At the time of his arrest, Mr. Dookhan was living in Queens, New York with his parents and brother.  At the time of the evaluation, he was an inmate at Ingham County Jail.  Prior to his arrival at Ingham County Jail, he had been held in several other facilities, including in New York, Oklahoma, and Newaygo County, Michigan.

***Relationship History***:  Mr. Dookhan reported that he was unmarried and had no children.  He reported one prior romantic relationship with a female partner for approximately one year when he was 25 years old; he estimated that she was one year younger.  He superficially described their activities together, including "talking and eating together."  Mr. Dookhan reported that the relationship ended when "she cheated on me."

2

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

Mr. Dookhan's brother, Roberto, reported no known romantic relationships.  He stated that Mr. Dookhan lived at home with the family and most activities outside of the home were accompanied by immediate or extended family members.  Roberto was aware of Mr. Dookhan having telephone conversations with others, but to his knowledge they never met in person.

*Educational History*: Mr. Dookhan had difficulty remembering his educational history.  He reported that he left school in twelfth grade when he was approximately 20 years old in 2014.  He unenrolled in school after he "did not pass all of my exams."  He did not complete any additional classes or education, including General Educational Development (GED) testing.  Mr. Dookhan reported that his grades were "high," but he did not pass exams.  When asked about his grade point average (GPA), he responded "56."  When asked again about his GPA, he again responded "56."

Mr. Dookhan reported that he repeated some grades after moving from Florida to New York, but he was unsure which grades.  He attended summer school in 2013 due to poor academic performance.  When asked about special education services, he said a 504 plan and an Individualized Education Plan (IEP) "sounded familiar," but he could not recall if he had formal services in place.  He reported receiving tutoring for specific subjects, including math, English, and social studies.  He did not recall receiving neuropsychological testing, such as IQ testing.  He disavowed a history of suspensions, expulsions, fighting, or truancy.

Roberto Dookhan, the defendant's brother, provided additional information regarding his educational history during my telephone interview.  He reported that the Guyanese educational system follows the British system, including primary and secondary school.  To advance to secondary school, students must complete a generalized educational exam, after which time they can select a secondary school based on performance.  Following testing, Mr. Dookhan's results were insufficient to advance to secondary school.  He was placed in a "lower community school" for two years, and then was accepted into secondary school; however, he was placed two grades lower than his chronologic age.

Roberto reported that Mr. Dookhan attended school for "a few months" in Florida upon arrival to the United States, but he was unsure what grade he attended.  After moving to New York, he was "possibly [placed] in a lower grade" relative to same-aged peers at John Adams High School in Queens.  Roberto confirmed that Mr. Dookhan left high school at age 20 years.  He reported that Mr. Dookhan was recommended for additional school supports, but he could not recall what they were as "we did not know there were programs."  He did not recall Mr. Dookhan being specifically evaluated for special education services.  When Mr. Dookhan left high school, the school district reached out to his mother to recommend additional educational programs, but these were not pursued.

Roberto stated that his mother often helped Mr. Dookhan complete homework assignments, but "exams are what kept him back."  He reported that Mr. Dookhan struggled with comprehension and application of information.

As indicated above, I requested school records from John Adams High School for review.  They were not received by the time of report submission.

*Developmental History:* Mr. Dookhan reported that he was not aware of his developmental history.  He was unsure if there were any complications during pregnancy or the birth process.  He did not know if there were any delays in milestone achievement, such as walking, talking, or toileting.

Roberto Dookhan, the defendant's brother, reported that he was unaware of any complications with the pregnancy or delivery of Mr. Dookhan.  He noted that Mr. Dookhan had a speech delay, and did not begin

3

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

speaking until five years of age.  Roberto stated, "we never looked at it any certain way… culturally we did not think of any concerns."  He noted that Mr. Dookhan struggles with comprehension of larger vocabulary words, and that the family "keeps things simple and slows down" when speaking with Mr. Dookhan.  He also estimated that Mr. Dookhan did not walk until he was approximately three years old.

Roberto reported that as a child, Mr. Dookhan was "very quiet in school."  He had friends in primary school and would bring them home for lunch; however, he also stated that peers would "take his lunch money and bully him."  He reported that despite these experiences, Mr. Dookhan was "always friendly" and never got into arguments or physical fights.  While in Guyana, Mr. Dookhan mostly spent free time with cousins and other extended family members.  After moving to the United States, Mr. Dookhan did not develop friendships.  Roberto noted that he "spent time strictly with family or family friends."

Roberto reported that into adulthood, Mr. Dookhan never left home and did not go anywhere by himself.  He noted that the first time Mr. Dookhan was away from home alone was following his arrest for his current charges.  He is independent in Activities of Daily Living (ADLs), such as bathing, toileting, eating, getting dressed, and grooming.  Mr. Dookhan requires assistance with some Independent Activities of Daily Living (IADLs).  From a finance management perspective, Roberto helped Mr. Dookhan establish a bank account and assisted him in setting up direct deposit from his employer and helped him pay his bills.  He reported that Mr. Dookhan would often give him cash to deposit into his account for him, and he required coaching and teaching regarding financial management.  Mr. Dookhan's parents assisted him in filing and paying his taxes every year.  Roberto identified that Mr. Dookhan's mother does laundry at home, but he noted there was a cultural component to this structure, and he was unsure if Mr. Dookhan could complete laundry on his own.  At home, meals were primarily cooked by parents or Roberto, although Mr. Dookhan could make simple meals such as frying an egg or cooking beans.  Mr. Dookhan could grocery shop if given a list, but he often went together with Roberto.  Chores and cleaning around the home were shared amongst family members.

Roberto reported that Mr. Dookhan earned a driver's license in approximately 2020 or 2021, but "that was a journey to get."  He noted that driving was a long-term goal of Mr. Dookhan, so the family supported him in pursuing it.  Mr. Dookhan took the permit test "four or five times" until he passed, and he passed the road test on the second occurrence.  After receiving his license, Mr. Dookhan primarily drove to and from work.  Roberto helped him practice the route from home to his employer multiple times before he drove the route on his own.

*__Occupational History__*:  Mr. Dookhan reported that at the time of his arrest, he was not employed.  He previously worked security at a charter school from September 2023 through June 2024.  This job ended when he "just left," and he clarified that he was not fired.  He stated he previously worked in a warehouse for approximately two and a half years from 2016 to 2019.  Otherwise, he did not have additional employment history.

Mr. Dookhan reported that he has his own bank account, and his brother helped him with finances including paying bills and credit cards.  He has never required a payee or other assistance with financial management.  He has never received social security or disability.

Mr. Dookhan's brother, Roberto Dookhan, reported that his past employment opportunities were primarily through family support.  He previously worked "as a helper" to his cousin installing telephone antennas.  He held a job at a clothing warehouse, also through his cousin; he did not stay in the position much longer after his cousin left the job.  Most recently, he worked with his father Mark Dookhan for a security company; Mark was his supervisor.  According to Roberto, Mark left the job in spring or early summer 2024, and Mr. Dookhan stopped working shortly thereafter in July 2024.

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

*__Military History__*:  Mr. Dookhan reported no history of involvement in the military.

*__Legal History__*:  Aside from Mr. Dookhan's current charges, he reported no history of arrest.  He reported no history of juvenile legal system involvement.  He estimated that he had received "a few parking tickets" in the past.

*__Medical History__*:   Mr. Dookhan reported that he had a seizure in his twenties which he stated was "related to caffeine."  He was hospitalized but not started on anti-seizure medications.  These seizures did not recur.  Otherwise, he disavowed a history of chronic illnesses, head trauma, or loss of consciousness.

Roberto Dookhan, the defendant's brother, provided more details regarding seizure history.  He reported that Mr. Dookhan experienced a seizure "out of nowhere" while the family was in Florida in 2019.  He observed that Mr. Dookhan "started to get stiff, his eyes went back, and he bit his tongue."  The event stopped but then returned "like a cluster" and he did not immediately return to his baseline level of understanding and thinking.  He was taken to the hospital, but he was not started on any medications, and he did not follow up with medical providers upon return to New York.  Roberto was not aware of what precipitated the seizure event.  As a result, the family "tried to reduce stress and keep him comfortable," including with work demands.  As noted in the Occupational History section, Mr. Dookhan's previous jobs have all been with family support.

*__Current Medications__*:  Mr. Dookhan reported that he does not take any prescription or over the counter medications or supplements.

*__Substance Use History:__* Mr. Dookhan reported first drinking alcohol at age 21 years.  At his most frequent pattern of use, he would drink on weekends, approximately two beers at a time.  He reported he last drank alcohol in 2020.  He disavowed associated symptoms of alcohol use disorder: drinking larger amounts over longer periods, desire or efforts to cut back, increased amount of time spent obtaining alcohol or recovering from its effects, cravings or urges to drink, failure to fulfill major obligations at work or school due to alcohol use, continued use despite interpersonal or social problems, important activities given up due to use, recurrent use in hazardous situations, continued use despite knowledge of problematic patterns of use, tolerance, and/or withdrawal.  He disavowed additional substance use or misuse, such as nicotine, tobacco, prescription medications, and illegal substances.

*__Family Psychiatric History:__* Mr. Dookhan reported no family history of psychiatric diagnoses, substance use disorders, or deaths by suicide.  He disavowed a history of neurodevelopmental disorders in family members, such as Autism Spectrum Disorder (ASD), Intellectual Disability (ID), and Attention-Deficit/Hyperactivity Disorder (ADHD).  He reported no history of genetic syndromes.  I also inquired about family history with his brother, Roberto Dookhan.  He also disavowed any family history of mental health conditions, genetic syndromes, or neurodevelopmental disorders.

*__Personal Psychiatric History__*:  Mr. Dookhan reported no history of psychiatric diagnoses, past psychiatric treatment including medication management or psychotherapy, or past psychiatric hospitalization(s).  He has never been prescribed a medication for mental health purposes.  He has never attempted suicide or engaged in self-injurious behavior.

Mr. Dookhan reported feeling "sad" and stressed when away from his family, including following his arrest for the current charges.  He stated he lost approximately twenty pounds due to the initial stress, but he has since gained it back.  He reported that he found support in prayer and contact with his family.  He disavowed additional symptoms of depression, including changes in sleep patterns, changes in energy,

5

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

anhedonia (decreased or inability to feel pleasure from previously enjoyable activities), excessive guilt, concentration difficulties, increased or decreased psychomotor movements (such as agitation or reduction), and thoughts of suicide or excessive preoccupation with death.

I systematically screened Mr. Dookhan for psychiatric symptoms as outlined in the Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition (DSM-5). Mr. Dookhan disavowed symptoms of psychosis, including auditory hallucinations (hearing sounds or voices that are not based in reality) and visual hallucinations (seeing things that are not based in reality).  He reported no history of delusional thinking, or fixed, false beliefs despite evidence to the contrary.  He specifically disavowed delusions or paranoia or persecution.  He reported no intrusive thoughts (obsessions) or repetitive acts that he is driven to perform (compulsions).  He reported no history of elevated mood, racing thoughts, or increased rate of speech, although he noted that sometimes people have difficulty understanding his English despite it being his primary language.  He disavowed a history of reckless behaviors or excessive involvement in activities with high potential for painful consequences.

Mr. Dookhan reported a history in childhood of having intermittent difficulty focusing on schoolwork. He disavowed impulsivity, irritability, difficulty sitting still, forgetting information, difficulty waiting his turn, or getting in trouble for talking too much in school.  He reported intermittently misplacing important items, such as his cell phone or his car keys.

Mr. Dookhan's brother, Roberto Dookhan, provided additional information regarding Mr. Dookhan's behavior in childhood, adolescence, and adulthood.  He reported that Mr. Dookhan can recognize nonverbal communication, but "I think he doesn't read it completely."  For example, he stated that Mr. Dookhan recognizes changes in tone and volume, such as "raised voices [may indicate] anger," but he has difficulty interpreting facial expressions and body language.  Roberto reported that Mr. Dookhan has difficulty incorporating nonverbal communication strategies into his communication, and at times struggles to comprehend "natural flow" of reciprocal communication.  Roberto initially stated that Mr. Dookhan does not have a history of restricted interests, or abnormalities in the intensity or topic of an interest.  However, later in the interview he reported that Mr. Dookhan has a specific interest in cars, including looking at cars and showing cars to others.  He knows various types of cars and their specifications, although "not deep into detail."  He has more recently become interested in Formula One (F1) racing, which is a shared interest between Mr. Dookhan and Roberto.  Otherwise, Roberto did not identify additional interests that are abnormal in their intensity or topic.

Roberto reported that Mr. Dookhan is easygoing and not rigid in his adherence to routines or schedule. He does not have a history of impulse control issues or behavior outbursts or tantrums.  Roberto commented "I am in awe of how quiet, peaceful, and loving he is."  He described Mr. Dookhan as "a pretty contented person."  He identified that Mr. Dookhan is generally a "rule follower," including not swearing at home and respecting elders.  He provided an example of rule following that Mr. Dookhan will "scold you if you speed up at a yellow light."

During the Zoom evaluation on June 4, 2025, I inquired about Mr. Dookhan's sexual interests and sexual history.  He reported that he is attracted to adult women.  He stated that he has had two previous partners, both adult women (the youngest being 21 years old), when he was 22 and 25 years old.  He disavowed sexual attraction to men, transgender or gender non-binary individuals, prepubescent or pubescent children or adolescents, or animals.  He estimated that he first watched pornography at age 21 years old, specifically sexual activity between men and women.  He disavowed watching content including rape or incest, children or adolescents, intentional infliction of suffering onto another, bestiality, or specific fetishized content.

6

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

I systematically screened for symptoms of paraphilic disorders as outlined in the Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition (DSM-5).  Mr. Dookhan disavowed sexual interest and arousal from voyeurism (observing unsuspecting persons who are naked and/or engaging in sexual activity), exhibitionism (exposure of one's genitals to an unsuspecting person), and frotteurism (touching or rubbing against a nonconsenting person).  He also reported no sexual interest or arousal from sadism (the physical or psychological suffering of another person).  He also reported no sexual interest or arousal from masochism (the act of being humiliated, beaten, or otherwise made to suffer) or sadism (the physical or psychological suffering of another person).  Mr. Dookhan disavowed fetishism, or sexual arousal from the use of nonliving objects or non-genital body parts.  He reported no sexual arousal from wearing clothing of the opposite gender.

***Present Psychiatric Symptoms:*** Mr. Dookhan reported no current symptoms consistent with a psychiatric disorder.  He described his mood as "I feel happy, I pray to god."  On systematic screening for psychiatric symptoms as outlined in the Diagnostic & Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), he disavowed current or recent symptoms of a mood disorder, anxiety disorder, obsessive-compulsive disorder, or thought disorder (such as Schizophrenia or Schizoaffective Disorder).

***Review of Available Records:*** In the Continuation in Support of Criminal Complain Report (undated), Special Agent David T. Deuman reviewed the facts and circumstances surrounding Mr. Dookhan's arrest for the current charges.  Special Agent Deuman documented that on September 11, 2024, he was contacted by Trooper Justin Lidak of the Michigan State Police (MSP) Gaylord Post regarding a child sexually abusive material (CSAM) investigation.  Trooper Lidak was dispatched to the residence of an eleven-year-old female (MV-1) after her family discovered she had been engaging in sexual conversations and sending nude photographs to adult men on the Roblox and JusTalk applications.

A forensic interviewer at the Women's Resource Center of Northern Michigan's Child Advocacy Center (CAC) conducted an interview of MV-1.  Special Agent Deuman summarized the statements made by MV-1, including that she met a guy on Roblox who acted her age.  His screen name was "Ryan."  MV-1 identified the person as "Ryan Dookhan," and he instructed her to download the JusTalk application.  His username on this application was "ryandookhan94."  The first time she called "Ryan," he said he would "search for her house and take her from her parents if she didn't show her vagina to him" and "threatened to do bad stuff to her."  MV-1 stated that his camera was always off when he called her.  She stated that she sent pictures of her body parts to him because she was scared, and she identified these body parts as her vagina.  "Ryan" expressed pleasure in the pictures and asked her to send more.  She first told "Ryan" that she was sixteen years old, and he told her that he was 29 years old.  At one point, she told him that she was eleven years old; she said he "didn't care" and "kept asking for pictures."  He used sexually explicit language and asked her for additional material.  He stated he would find her location if she did not send it.  MV-1 stated she complied because she was scared.

A search of the phone belonging to MV-1 revealed multiple sexually explicit conversations, photographs, and videos sent and received between MV-1 and username "ryandookhan94" via the JusTalk application between June 10, 2024, and August 8, 2024.  A description of the CSAM was provided in the report.

***Mental Status Examination on 06/04/2025 (conducted via Zoom):***  Mr. Dookhan appeared his stated age.  He had fair hygiene and was mildly disheveled with an unkempt beard.  He was wearing clean jail attire and glasses.  He had fair dentition.  Mr. Dookhan remained seated in a chair at a desk throughout the evaluation. His eye contact was appropriate.  He spoke with a regular rate, volume, and tone, although at times was asked to repeat himself due to sound reverberation into the Zoom audio system.  He had no comprehension difficulties, although did at times need definitions of words and/or use of simplified language.

7

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

Mr. Dookhan described his mood as "better," and his nonverbal expression of affect was consistent with this report.  His range of emotional expression was mildly restricted but appropriate.

Me. Dookhan presented thoughts in a logical and coherent fashion, albeit concrete.  There was no evidence of disorganization in his thinking. He reported no suicidal or homicidal ideation.  He reported no perceptual disturbances to include auditory and visual hallucinations. He did not appear to be internally preoccupied. There was no evidence of paranoia or delusional thinking.

Mr. Dookhan was fully oriented to himself, the date, the location and his situation.  His concentration was intact to interview. On formal testing of attention, he was able to list the days of the week backwards and spell the word "WORLD" forward and backward.  I initially asked him to serially subtract sevens from the number 100, which he was not able to perform; when simplified, he was able to serially subtract threes from twenty with one initial error.  His fund of knowledge was limited.  He was able to name the current President and two preceding presidents.  He knew the names of three oceans, but he was unable to identify any continents.  When asked to name five cities in the United States, he initially provided five states on two prompts; with additional clarification, he was able to name five cities.  Mr. Dookhan's memory was intact to recent and remote events. On formal testing, he was able to recall three of three words immediately and after five words.  His capacity for abstract thought was limited, as evidenced by his identification of similarities between three sets of two items.  When asked about the similarities between a train and a car, he responded, "they move" (transportation).  When asked about the similarities between a table and a chair, he responded, "they have four legs" and "they are square."  When asked about similarities between a watch and a ruler, he responded, "they have numbers" and "they are straight."

His insight was fair as evidenced by his knowledge of his current charges and legal situation. His judgement was good as evidenced by his participation in the evaluation and his engagement with his lawyer.  When presented with hypothetical scenarios, he demonstrated limited judgment.  For example, when asked what he would do if he found a stamped, addressed, and sealed envelope on the ground, he initially responded "is it in my name, or someone else's?"  He then stated he would return it to the address listed.  He did not reach the conclusion that it could be mailed.  When asked about what he would do if he was the first person to see a small fire in a crowded movie theater, he replied "I would shout [fire] and say 'everybody run'… [I would] try to help everyone get out."

### *Diagnoses:*

1.  Intellectual Disability, Mild - provisional

    This diagnosis is based on the following information:
    a.  Mr. Dookhan has intellectual and adaptive functioning deficits in the conceptual, social, and practical domains, and meets criteria for the following:
        i.  Mr. Dookhan demonstrated deficits in intellectual reasoning.
            1.  During my evaluation, Mr. Dookhan had difficulty with abstract reasoning and problem solving.
                a.  On formal abstraction testing, Mr. Dookhan demonstrated concrete thinking when asked for similarities between two items.
                b.  When given hypothetical scenarios, Mr. Dookhan had difficulty problem solving when given hypothetical scenarios.  For example, he had difficulty discussing what he would do with an addressed, stamped envelope found on the ground.

8

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

      c.  Mr. Dookhan had a concrete understanding of the evaluation itself, asking if it was "pass/fail," despite earlier education regarding the nature of the evaluation and related report.

2. During my evaluation, Mr. Dookhan had difficulty understanding complex vocabulary typical for a same-aged peer, which necessitated simple language and explanation of words to ensure understanding.

3. In review of his academic history, Mr. Dookhan's brother, Roberto Dookhan, reported the following:

      a.  Mr. Dookhan failed secondary school placement exams while living in Guyana.  He was placed in a lower community school setting before ultimately passing, and he entered secondary school two full grades lower than his chronological age.

      b.  Mr. Dookhan was placed in a lower grade on arrival to New York compared to same-aged peers.

      c.  Mr. Dookhan was recommended for additional school supports, but the family did not pursue them as they were not aware such programs existed.

4. During my evaluation, Mr. Dookhan reported the following with respect to academic learning deficits:

      a.  He was held back multiple grades when he moved from Guyana to the United States, leading him to be placed below grade level for his chronological age.

      b.  He left school at age twenty after failing multiple exams. He did not pursue additional educational opportunities.

ii. Mr. Dookhan demonstrated deficits in adaptive functioning resulting in the failure to meet developmental and sociocultural standards for personal independence and social responsibility.  These deficits limit functioning in the home, work, and community environments.

1. Mr. Dookhan has never lived independently, spending the entirety of his adulthood under the care of his parents.

2. Mr. Dookhan requires support in instrumental activities of daily living (IADLs), including financial management and banking, paying bills and taxes, and cooking nutritious meals.  These supports were provided by his parents and his older brother.

3. When Mr. Dookhan held employment, he was supported by other family members who worked or supervised in these settings, including his father and cousins.  As reported by his older brother, Mr. Dookhan did not maintain these employment opportunities after supportive family members left their positions.

b. Mr. Dookhan's deficits began in the developmental period, specifically during childhood. According to his brother, he had evidence of intellectual and adaptive functioning deficits in primary school while living in Guyana that have continued through adolescence and into adulthood.

The specifier "Mild" is used due to the level of adaptive functioning Mr. Dookhan demonstrates. In the conceptual domain, Mr. Dookhan demonstrates difficulty with abstract thinking and impairment functional use of academic skills, such as money management.  During abstraction testing, he demonstrated a concrete approach to problem-solving compared to other adults of similar age and background.  In the social domain, Mr. Dookhan uses more concrete and immature language, and he has difficulty with complex social communication including

9

RE:  RYAN ROMARIO DOOKHAN
DOB: 12/11/1994
CASE NO:  1:25-cr-00011-HYJ

interpreting non-verbal social cues.  In the practical domain, he requires support with complex daily living tasks, such as banking and money management and nutritious food preparation.  He has required support from immediate and extended family in employment, and he has not sustained employment positions beyond transitions by family members to other opportunities.

The diagnosis is provisional as I do not have contemporaneous records from childhood to review and apply to the diagnostic impression based on the direct evaluation and collateral information from Mr. Dookhan's family, which has the potential for bias.  I have requested records from his most recent school, John Adams High School in Queens, New York.  These records were not received by the time of this report.  The information in these records may support or influence this opinion once received.

I considered a diagnosis of a Paraphilic Disorder, such as Pedophilic Disorder, given the instant charges and the information included in the Continuation in Support of Criminal Complaint Report.  However, Mr. Dookhan disavowed sexual attraction towards prepubescent children, and there was insufficient evidence of a pattern of this behavior or sexual interest during my evaluation, collateral information, or available records.

***Opinion/Recommendations:***  It is my opinion, with reasonable medical certainty, that Ryan Romario Dookhan meets criteria for the provisional diagnosis of Intellectual Disability, Mild, based on DSM-5 criteria.  While there is no specific psychiatric or psychotherapeutic intervention to treat this diagnosis but given the risk of comorbid mental health conditions such as a mood or anxiety disorder, periodic monitoring for emergence of comorbid psychiatric disorders is warranted.  Court and jail personnel should use simple, clear, and concise language in communication about processes, expectations, and rules.

As previously mentioned, this opinion is provisional.  I have requested school records, which may change my opinion.  I am available to review my report and revise if these records are obtained.  I would be pleased to answer any additional questions regarding this psychodiagnostic evaluation.

Respectfully Submitted,

_____
**Kathleen L. Kruse, M.D.**
Psychiatrist
Board-Certified in Adult, Child and
Adolescent, and Forensic Psychiatry

10